## BOARD OF RAILROAD COMMISSIONERS OF NORTH DAKOTA ET AL. *v.* GREAT NORTHERN RAILWAY COMPANY ET AL.

No. 364.  Argued April 17, 1930.—Decided May 19, 1930.

*Mr. James Morris,* Attorney General of North Dakota, with whom *Mr. John E. Benton* was on the brief, for appellants.

414

*Mr. R. J. Hagman,* with whom *Messrs. D. F. Lyons* and *F. G. Dorety* were on the brief, for appellees.

*Messrs. Henry N. Benson,* Attorney General of Minnesota, *Charles E. Phillips* and *John F. Bonner,* Assistant Attorneys General, by special leave of Court, filed a brief as *amici curiae,* on behalf of the Railroad and Warehouse Commission of Minnesota.

*Mr. John E. Benton,* by special leave of Court, filed a brief as *amicus curiae,* on behalf of the Public Service Commission of Alabama et al.

Mr. Chief Justice Hughes delivered the opinion of the Court.

On May 8, 1929, the Board of Railroad Commissioners of the State of North Dakota made an order prescribing intrastate class rates. The existing rates were reduced about ten per cent and the order was made effective on July 1, 1929. The appellees, common carriers engaged in interstate transportation and also in intrastate transportation in North Dakota, brought this suit on June 25, 1929, in the District Court to enjoin enforcement of the order pending the determination by the Interstate Commerce Commission of the question whether the intrastate rates, as thus prescribed, cause an undue or unreasonable discrimination against interstate commerce in violation of Section 13 of the Interstate Commerce Act. The District Court, composed of three Judges, as required by statute, granted an interlocutory injunction to this effect (33 Fed. (2d) 934) and the Railroad Commission of the State and the other State officials, who were defendants, have brought this appeal.

On August 26, 1920, the Interstate Commerce Commission, in a proceeding known as *Ex parte 74,* authorized a general advance in interstate freight rates throughout the United States. *Increased Rates, 1920,* 58 I. C. C. 220. The appellees then applied to the Board of Railroad Commissioners of North Dakota for authority to make

increases in the North Dakota intrastate class rates to correspond with the increases which had been made in the interstate class rates. The State Commission denied the application. Thereupon, in a proceeding (Docket No. 12,085) under Section 13 of the Interstate Commerce Act the Interstate Commerce Commission made a finding that the interstate rates established by the carriers, as a result of the decision in *Ex parte 74,* were reasonable for interstate transportation and that the failure correspondingly to increase the intrastate rates within the State of North Dakota resulted in an undue preference to the shippers of intrastate traffic within that State and in an unjust discrimination against interstate commerce. On May 3, 1921, the Interstate Commerce Commission entered an order requiring these carriers to increase the intrastate freight rates in North Dakota so as to correspond with the advances in interstate rates. *North Dakota Rates, Fares, and Charges,* 61 I. C. C. 504. These increases were made, effective May 27, 1921.

On June 5, 1922, the Board of Railroad Commissioners of North Dakota made an order reciting that the order of the Interstate Commerce Commission of May 3, 1921, practically deprived the State Commission of its power to regulate intrastate rates and that appropriate action should be taken to terminate the disability. Upon application by the State Commission, the Interstate Commerce Commission (July 22, 1922) vacated its order of May 3, 1921, in so far as it related to intrastate rates in North Dakota, stating that "the existing increased intrastate rates and charges for freight services in said State will continue in force and effect until revoked, modified or superseded by appropriate lawful proceedings before said Board" (the State Commission) "or as otherwise provided by law." The State Commission was thus left free to exercise its lawful authority over intrastate rates.

The Congress, by Joint Resolution of January 30, 1925 (43 Stat. 801), directed the Interstate Commerce Commission to make an investigation of the rate structure of common carriers in order to determine to what extent and in what manner existing rates and charges might be unreasonable or unjustly discriminatory, and to make such changes, adjustments and redistribution of rates and charges as might be found to be necessary. The Commission was required to make from time to time such decisions as it might deem appropriate to establish a just and reasonable relation between rates upon designated classes of traffic.[1] Pursuant to this direction, the Inter-

---

[1] The provision relating to the investigation is as follows:

" That the Interstate Commerce Commission is authorized and directed to make a thorough investigation of the rate structure of common carriers subject to the interstate commerce act, in order to determine to what extent and in what manner existing rates and charges may be unjust, unreasonable, unjustly discriminatory, or unduly preferential, thereby imposing undue burdens, or giving undue advantage as between the various localities and parts of the country, the various classes of traffic, and the various classes and kinds of commodities, and to make, in accordance with law, such changes, adjustments, and redistribution of rates and charges as may be found necessary to correct any defects so found to exist. In making any such change, adjustment, or redistribution the commission shall give due regard, among other factors, to the general and comparative levels in market value of the various classes and kinds of commodities as indicated over a reasonable period of years, to a natural and proper development of the country as a whole, and to the maintenance of an adequate system of transportation. In the progress of such investigation the commission shall, from time to time, and as expeditiously as possible, make such decisions and orders as it may find to be necessary or appropriate upon the record then made in order to place the rates upon designated classes of traffic upon a just and reasonable basis with relation to other rates. Such investigation shall be conducted with due regard to other investigations or proceedings affecting rate adjustments which may be pending before the commission." 43 Stat. 801.

state Commerce Commission on March 12, 1925, instituted the proceeding known as Docket No. 17000, "Rate Structure Investigation," and all common carriers subject to the Interstate Commerce Act were made respondents. Notice was sent to the Governor of each State and to the state regulatory commissions. The Interstate Commerce Commission thus undertook the investigation of the rate structure in the entire western district, including class rates in the region embracing the State of North Dakota. The Board of Railroad Commissioners of that State, with other state railroad commissions, have been coöperating in this investigation and the proceeding is still pending.

On May 29, 1925, the Board of Railroad Commissioners of North Dakota on its own motion began an investigation for the purpose of determining to what extent, if any, the North Dakota intrastate rates were unreasonable or unjustly discriminatory. In September, 1927, the State Commission directed that the record should be held open for further hearing after the Interstate Commerce Commission rendered a decision in its Docket No. 17000. A few months later, the State Commission resumed its general investigation and a hearing was held in relation to class rates and certain other rates. This resulted in the order of May 8, 1929, now in question, reducing the existing intrastate class rates.

The appellees then filed a petition with the Interstate Commerce Commission alleging that the scale of class rates required by the State Commission would unjustly discriminate against persons and localities in interstate commerce, and would constitute an unreasonable burden on interstate commerce, in violation of Section 13 of the Interstate Commerce Act, and asked the Interstate Commerce Commission to institute a proceeding to determine whether such unjust discrimination would result and to

prohibit it by prescribing the class rates to be charged by the carriers for intrastate transportation in North Dakota. Thereupon, this suit was brought. The interlocutory injunction, granted below, restrained the State Commission and other state officials from putting into effect the intrastate class rates prescribed by the order of May 8, 1929, until the Interstate Commerce Commission, either in its Docket No. 17000, or in the proceeding under Section 13 of the Interstate Commerce Act which the plaintiffs (appellees) had petitioned the Interstate Commerce Commission to institute, determined the question of unjust discrimination with respect to interstate commerce, and until the further order of the Court.

It should be observed at the outset that there is no contention on the part of the carriers that the intrastate rates fixed by the State Commission are confiscatory. There is no challenge of the authority of the State Commission under the constitution and laws of the State to prescribe these rates for intrastate traffic, or of the validity or regularity of the proceedings which resulted in the order of the State Commission, aside from the alleged effect upon interstate commerce.

The question of the control of the State, as against an objection of this sort, over rates for transportation exclusively intrastate was considered in the *Minnesota Rate Cases*. (230 U. S. 352.) The State of Minnesota had established rates for intrastate transportation throughout the State, and the complaining carriers insisted that by reason of the passage of the Interstate Commerce Act the State could no longer exercise the untrammeled statewide authority that it had formerly enjoyed in prescribing reasonable intrastate rates, and that the scheme of rates which Minnesota had prescribed, even if found to be otherwise not subject to attack, was void because of their injurious effect upon interstate commerce. There had been no finding by the Interstate Commerce Commission

of unjust discrimination against interstate commerce by reason of the intrastate rates and, reserving the question of the validity and consequence of such a finding if one were made by the Interstate Commerce Commission, the Court decided that there was no ground for invalidating the action of the State. Dealing with the interblending of operations in the conduct of interstate and local business by interstate carriers, the Court said that these considerations were for the practical judgment of Congress, and that if adequate regulation of interstate rates could not be maintained without imposing requirements as to such intrastate rates as substantially affected the former, it was for Congress, within the limits of its constitutional authority over interstate commerce, to determine the measure of the regulation it should apply. It was not the function of the Court to provide a more comprehensive scheme of regulation than Congress had decided upon, nor, in the absence of Federal action, to deny effect to the laws of the State enacted within the field which it was entitled to occupy until its authority was limited through the exertion by Congress of its paramount constitutional power. On the assumption that Section 3 of the Interstate Commerce Act should be construed as applicable to unreasonable discriminations between localities in different States, as well when arising from an intrastate rate as compared with an interstate rate as when due to interstate rates exclusively, the Court was of the opinion that the controlling principle governing the enforcement of the act should be applied to such cases and that the question of the existence of such a discrimination would be primarily for the investigation and determination of the Interstate Commerce Commission and not for the courts. (*Id.* p. 419.)

The controlling principle, thus invoked, was derived from a consideration of the nature of the question and of the inquiry and action required for its solution. The

inquiry would necessarily relate to technical and intricate matters of fact, and the solution of the question would demand the exercise of sound administrative discretion. The accomplishment of the purpose of Congress could not be had without the comprehensive study of an expert body continuously employed in administrative supervision. Only through the action of such a body could there be secured the uniformity of ruling upon which appropriate protection from unreasonable exactions and unjust discriminations must depend. (*Id.* pp. 419, 420. See *Great Northern Railway Company* v. *Merchants Elevator Company*, 259 U. S. 285, 291.)

The application of this principle had frequent illustration before the question arose as to unjust discriminations against interstate commerce through the fixing of intrastate rates. In *Texas & Pacific Railway Company* v. *Abilene Cotton Oil Company* (204 U. S. 426), the Court decided that a shipper could not maintain an action because of the exaction of an alleged unreasonable rate on interstate shipments, when the rate had been duly filed and published by the carrier and had not been found to be unreasonable by the Interstate Commerce Commission. The Court found an indissoluble unity between the provision for the maintenance of rates as established in accordance with the statute and the prohibitions against preferences and discriminations, and declared that to maintain the just relation which the statute was intended to conserve it was essential that there should be uniformity of decision and that redress should be sought primarily through the administrative powers entrusted to the Interstate Commerce Commission. In *Baltimore & Ohio Railroad Company* v. *United States ex rel. Pitcairn Coal Company* (215 U. S. 481), complaint was made by the coal company of the method of distribution of coal cars, which was said to amount to an unjust discrimination. The Court considered the controversy to be con-

trolled by the decision in the *Abilene* case, *supra,* and that the grievances of which complaint was made were primarily within the administrative competency of the Interstate Commerce Commission. The Court said that the amendments of 1906 of the Interstate Commerce Act rendered, if possible, more imperative the construction which had been given to the act in this respect. After adverting to the case of *Interstate Commerce Commission* v. *Illinois Central Railroad Company* (215 U. S. 452), the Court again pointed out " the destructive effect upon the system of regulation adopted by the Act to Regulate Commerce," if it were construed as " giving authority to the courts, without the preliminary action of the commission, to consider and pass upon the administrative questions which the statute has primarily confided to that body." (215 U. S. p. 496.)  The question was again considered in *Robinson* v. *Baltimore & Ohio Railroad Company* (222 U. S. 506), where the Court held that no action for reparation for discriminatory exactions for freight payments could be maintained in any Court, Federal or state, in the absence of an appropriate finding and order of the Interstate Commerce Commission. Referring to the *Abilene* case, *supra,* the Court said, " It is true that . . . in that case the complaint against the established rate was that it was unreasonable, while here the complaint is that the rate was unjustly discriminatory. But the distinction is not material."  (*Id.* p. 511.) [2]

[2] See, also, *United States* v. *Pacific & Arctic Co.,* 228 U. S. 87, 107, 108; *Mitchell Coal Co.* v. *Pennsylvania R. R. Co.,* 230 U. S. 247, 259; *Texas & Pacific Railway Co.* v. *American Tie & Lumber Co.,* 234 U. S. 138, 147; *Pennsylvania R. R. Co.* v. *Puritan Coal Co.,* 237 U. S. 121, 131; *Pennsylvania R. R. Co.* v. *Clark Coal Co.,* 238 U. S. 456, 469; *Northern Pacific Railway Co.* v. *Solum,* 247 U. S. 477, 483; *Director General of Railroads* v. *Viscose Company,* 254 U. S. 498, 504; *Great Northern Railway Co.* v. *Merchants Elevator Company,* 259 U. S. 285, 291, 295; *Terminal R. R. Ass'n* v. *United States,* 266 U. S. 17, 31; *Western & Atlantic Railroad* v. *Georgia Public Service Commission,* 267 U. S. 493, 497.

424

The grounds for invoking this principle of preliminary resort to the Interstate Commerce Commission are even stronger when the effort is made to invalidate intrastate rates upon the ground of unjust discrimination against interstate commerce. Not only are the questions as to the effect of intrastate rates upon interstate rates quite as intricate as those relating to discrimination in interstate rates, not only is there at least an equal need for the comprehensive, expert and continuous study of the Interstate Commerce Commission, and for the uniformity obtainable only through its action, but in addition there is involved a prospective interference with State action within its normal field, in relation to the domestic concern of transportation exclusively intrastate. The Court found no warrant for the contention that Congress in enacting the Interstate Commerce Act intended that there should be such an interference before the fact of unjust discrimination had been established by competent inquiry on the part of the administrative authority to which Congress had entrusted the solution of that class of questions.

What was lacking in the *Minnesota Rate Cases, supra,* had been supplied in the *Shreveport Case* (234 U. S. 342).[3] There, the Interstate Commerce Commission had found that there was an unjust discrimination arising out of the relation of intrastate rates, maintained under State authority, to interstate rates which had been upheld as reasonable. The Court decided that Congress in exercising its constitutional authority could correct the evil of this discrimination against interstate commerce and that in so doing Congress was entitled to secure the maintenance of its own standard of interstate rates. Having this power, Congress could provide for its exercise through the aid of a subordinate body. The removal of the discrimination

---

[3] *Houston, East and West Texas Railway Company* v. *United States,* 234 U. S. 342.

was within the authority granted to the Interstate Commerce Commission and the decision rested upon the ground that this authority had been exercised. (*Id.* pp. 357, 358. See, also *American Express Company* v. *Caldwell*, 244 U. S. 617, 625; *Illinois Central Railroad Company* v. *State Public Utilities Commission*, 245 U. S. 493, 506; *Arkansas Railroad Commission* v. *Chicago R. I. & P. R. R. Co.*, 274 U. S. 597, 599.)

In the Transportation Act, 1920 (41 Stat. 484) Congress enacted express provisions with respect to intrastate rates, regulations and practices. (*Id.* Sec. 416.) Amending Section 13 of the Act to Regulate Commerce, Congress authorized the Interstate Commerce Commission to confer with state regulatory bodies with respect to " the relationship between rate structures and practices of carriers subject to the jurisdiction of such State bodies and of the Commission," and to hold joint hearings. It was provided that whenever in any such investigation, after full hearing, the Commission finds that any rate, regulation or practice " causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce, which is hereby forbidden and declared to be unlawful," the Commission shall prescribe the rate, regulation or practice " thereafter to be observed, in such manner as, in its judgment, will remove" the discrimination. The order of the Commission is to bind the carriers, parties to the proceeding, " the law of any State or the decision or order of any State authority to the contrary notwithstanding." [4]

---

[4] The text of the provisions thus added to Section 13 is as follows:
" Sec. 13. . . .

"(3) Whenever in any investigation under the provisions of this Act, or in any investigation instituted upon petition of the carrier

There can be no doubt that Congress thus intended to recognize and incorporate in legislative enactment the principle of the *Shreveport Case, supra.*[5]  We find no

concerned, which petition is hereby authorized to be filed, there shall be brought in issue any rate, fare, charge, classification, regulation, or practice, made or imposed by authority of any State, or initiated by the President during the period of Federal control, the Commission, before proceeding to hear and dispose of such issue, shall cause the State or States interested to be notified of the proceeding.  The Commission may confer with the authorities of any State having regulatory jurisdiction over the class of persons and corporations subject to this Act with respect to the relationship between rate structures and practices of carriers subject to the jurisdiction of such State bodies and of the Commission; and to that end is authorized and empowered, under rules to be prescribed by it, and which may be modified from time to time, to hold joint hearings with any such State regulating bodies on any matters wherein the Commission is empowered to act and where the rate-making authority of a State is or may be affected by the action taken by the Commission.  The Commission is also authorized to avail itself of the cooperation, services, records, and facilities of such State authorities in the enforcement of any provision of this Act.

"(4) Whenever in any such investigation the Commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce, which is hereby forbidden and declared to be unlawful, it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, or discrimination.  Such rates, fares, charges, classifications, regulations, and practices shall be observed while in effect by the carriers parties to such proceeding affected thereby, the law of any State or the decision or order of any State authority to the contrary notwithstanding."

[5] In presenting these amendments to the Committee of the Whole House, Mr. Esch, Chairman of the Committee on Interstate and Foreign Commerce of the House of Representatives, said:

basis for the conclusion that it was the purpose of Congress to interdict a state rate, otherwise lawfully established for transportation exclusively intrastate, before appropriate action by the Interstate Commerce Commission. On the contrary, Congress sought to provide a more satisfactory administrative procedure which would

---

" We also provide for the enactment into law of what is popularly known as the decisions of the Supreme Court in the Shreveport case. Where intrastate rates constitute an undue burden, advantage, preference or prejudice against interstate rates, such rates are declared to be unlawful. We have incorporated into law the decision of the court. When by reason of the low level of the intrastate rates an undue burden is cast upon the interstate traffic the citizens and the shippers of other States are compelled to pay higher interstate freight rates than they would have had to pay had that State enacted or put into force and effect proper intrastate rates. We give this power of determination to the Interstate Commerce Commission, but in order that the State commissions may have a proper hearing we provide that the State commissions may, to use a phrase of the street, ' sit in ' with the Interstate Commerce Commission. It can sit with the Interstate Commerce Commission; it can hear the testimony, and can present its full case, through its legally constituted authority. It can present the full case, but the final adjudication is to rest with the Interstate Commerce Commission and not with the State regulatory body. We believe that this getting together of the interstate and State regulatory bodies will lessen the number of Shreveport cases, better the feeling between the interstate and the State commissions, and promote the commercial interests of the country." Cong. Rec., 66th Cong., 1st Sess., Vol. 58, pt. 8, p. 8317.

Senator Cummins, Chairman of the Committee on Interstate Commerce of the Senate, made the following statement to the Committee of the Whole of the Senate:

" I need not follow that case " (the Shreveport case) " in all its phases; but it finally reached the Supreme Court of the United States, and the Supreme Court held that the authority of the Federal Government as it could be vested in the Interstate Commerce Commission extended to the removal of a discrimination between the interstate rates and the intrastate rates, but no authority had been given by Congress to the commission to declare what the intrastate rate should be in comparison with the interstate rate. . . .

elicit the coöperation of the State regulatory bodies, and insure a full examination of all the questions of fact which such bodies might raise, before any finding was made in such a case as to unjust discrimination against interstate commerce or any order was entered superseding the rate authorized by the State. In sustaining the authority of the Commission under Section 13 as thus amended, the Court said in *Railroad Commission of Wisconsin* v. *Chicago, Burlington & Quincy Railroad Company* (257 U. S. 563, 590, 591): "It is said that our conclusion gives the Commission unified control of interstate and intrastate commerce. It is only unified to the extent of maintaining efficient regulation of interstate commerce under the paramount power of Congress. It does not involve general regulation of intrastate commerce. Action of the Interstate Commerce Commission in this regard should be directed to substantial disparity which operates as a real discrimination against, and obstruction to, interstate commerce, and must leave appropriate discretion to the

---

" The committee has attempted simply to express the decisions of the Supreme Court of the United States. We have not attempted to carry the authority of Congress beyond the exact point ruled by the Supreme Court in the cases to which I have referred; and the only thing we have done in the matter has been to confer upon the Interstate Commerce Commission the authority to remove the discrimination when established in a proper proceeding before that body—an authority which it does not now have. . . .

" The Supreme Court held that Congress had not conferred upon the Interstate Commerce Commission the right to prescribe a rate in the stead of one which had been condemned; but so far as the condemnation of the rates is concerned, the power of the Interstate Commerce Commission is already ample, and it has succeeded in one way or another in removing the discriminations which have come under its notice without the statute which we now propose." Cong. Rec., 66th Cong., 2d Sess., Vol. 59, pt. 1, pp. 142, 143.

state authorities to deal with intrastate rates as between themselves on the general level which the Interstate Commerce Commission has found to be fair to interstate commerce." See *Arkansas Railroad Commission* v. *Chicago, R. I. & P. R. R. Co., supra.*

When, before the amendments of 1910 of the Interstate Commerce Act, the question arose as to the propriety of judicial action in granting injunctions against the maintenance of interstate rates, filed and published by carriers as provided by law, pending the decision of the Interstate Commerce Commission whether such rates were unreasonable or unjustly discriminatory, there was a conflict of opinion in the lower Federal courts, but the weight of decision was that such relief, although temporary in character, could not be granted prior to an appropriate finding by the Interstate Commerce Commission, and this ruling accorded with the principle declared by this Court in the *Abilene* and other cases, *supra.*[6] Congress, in 1910, authorized the Interstate Commerce Commission, on the filing of rates by interstate carriers with the Commission, to suspend the operation of the rates for a stated period, and this provision has been continued in later legislation. Interstate Commerce Act, Sec. 15 (7); 36 Stat. 552; 41 Stat. 486, 487. This power of suspension was entrusted to the Commission only. There

[6] See *Atlantic Coast Line R. R. Co.* v. *Macon Grocery Co.,* 166 Fed. 206; *Columbus Iron & Steel Company* v. *Kanawha & M. Ry. Co.,* 178 Fed. 261; *Wickwire Steel Company* v. *New York Central R. R. Co.,* 181 Fed. 316. Compare *Jewett Bros.* v. *Chicago, M. & St. P. Ry. Co.,* 156 Fed. 160; *Kiser Company* v. *Central of Georgia R. R. Co.,* 158 Fed. 193; 236 Fed. 573; *Northern Pacific R. R. Co.* v. *Pacific Coast Lumber Mfrs. Assn.,* 165 Fed. 1; *Great Northern Ry. Co.* v. *Kalispell Lumber Co.,* 165 Fed. 25.

is no similar provision for the suspension of intrastate rates established by state authority.

It is said that the interlocutory injunction, granted below, was in aid of the proceedings pending before the Interstate Commerce Commission. But the injunction necessarily has the effect of preventing the State from enforcing the rates it has prescribed, which are lawful rates until the Interstate Commerce Commission finds that they cause an unjust discrimination against interstate commerce. A judicial restraint of the enforcement of intrastate rates, although limited to the pendency of proceedings before the Interstate Commerce Commission, is none the less essentially a restraint upon the power of the State to establish rates for its internal commerce, a power the exercise of which in prescribing rates otherwise valid is not subject to interference upon the sole ground of injury to interstate commerce, save as Congress has validly provided. Congress has so provided only in the event that, after full hearing in which the State authorities may participate, the Interstate Commerce Commission finds that unjust discrimination is created. Congress forbids the unjust discrimination through the fixing of intrastate rates but entrusts the appropriate enforcement of its prohibition primarily to its administrative agency.

It is urged that the restraining power of the Court is needed to prevent irreparable injury. But, in this class of cases, the questions whether there is injury, and what the measures shall be to prevent it, is committed for its solution preliminarily to the Interstate Commerce Commission.

For these reasons, the order of the District Court is reversed and the cause remanded with direction to dismiss the bill of complaint.

*It is so ordered.*