**UNITED STATES v. RAILWAY EXPRESS AGENCY, Inc.**

**Civ. No. 1155.**

United States District Court
D. Delaware.
April 3, 1950.

William Marvel, United States Attorney, of Wilmington, Del., Herbert A. Bergson, Assistant Attorney General, Stanley E. Disney, James E. Kilday, Richard E. Guggenheim, Joseph E. McDowell, Special Assistants to the Attorney General, and Gareth M. Neville, Special Attorney, of Washington, D. C., for plaintiff.

C. A. Southerland and Daniel F. Wolcott (Southerland, Berl & Potter) of Wilmington, Del.; Francis M. Shea and Warner W. Gardner (Shea, Greenman, Gardner & McConnaughey) of Washington, D. C.; J. H. Mooers and J. F. Mann of New York City; Albert Ward of Philadelphia, Pa. and Sidney S. Alderman of Washington, D. C., for defendant.

RODNEY, District Judge.

This is a civil action brought by the United States under Section 4 of the Sherman Act, charging the defendant with violation of Sections 1 and 2 of that Act.[1] The complaint charges generally that the defendant by reason of the terms of uniform operating agreements, which it has entered into with virtually all of the railroads of the United States, has entered into contracts in restraint of trade among the several states in the express transportation business and has monopolized trade in the express transportation business by railroad among the several states. More specifically the Government complains of those portions of the operating agreements which constitute the defendant the exclusive agent of the several railroads in the express business and prohibit the railroads from engaging in the business.

Defendant filed its answer on December 30, 1948, answering on the merits and moving for the dismissal of the complaint. In its answer it also moved to dismiss the action without prejudice to the right of the Government to reinstitute it or alternatively to stay the proceedings pending the conclusion of "appropriate proceedings before the Interstate Commerce Commission." On April 18, 1948, the Government filed a motion for judgment on the pleadings. Shortly before this, on or about March 31, 1949, the defendant herein had filed with the Interstate Commerce Commission a petition praying that the Commission's prior orders approving the creation and establishment of defendant and the pooling provisions of the uniform operating agreements either be clarified or supplemented in certain respects relevant to the present antitrust proceedings. On May 9, 1949, the Commission ordered that action on the petition be deferred until this court should determine defendant's motion to dismiss or to stay.

There are thus pending for determination by this court plaintiff's motion for judgment on the pleadings under Federal Rules of Civil Procedure, Rule 12(c), 28 U.S.C.A., and two motions made by the defendant: (1) a motion to dismiss which appears to to be complementary to plaintiff's motion for judgment on the pleadings; and (2) a motion to dismiss without prejudice or alternatively to stay the proceedings pending action by the Interstate Commerce Commission on defendant's petition of March 31, 1949. These various motions were argued at the same time by the parties, and have been fully briefed.

1. 15 U.S.C.A. §§ 1, 2 and 4.

A proper consideration of the bases upon which the motions are founded requires a brief statement of the underlying facts. The express transportation business is stated to have had its origin in 1839. For many years it was unregulated, even after the creation of the Interstate Commerce Commission in 1887. The express companies seem first to have been brought within the jurisdiction of the Commission by the Hepburn Act in 1906.[2] In 1912 the Commission made an exhaustive report on the history, rates, practices and affairs of the thirteen express companies which then seem to have been in existence.[3] In 1918 the Government took over the railroads,[4] and the Director General of Railroads insisted upon a consolidation of the then existing express companies into one company, American Railway Express Company. In the Transportation Act of 1920, Congress authorized the continued consolidation of the railway express business into American Railway Express Company, if the Interstate Commerce Commission should approve it. The Commission approved it in December, 1920, and at the same time approved the pooling provision contained in the uniform operating agreement, which also had exclusive agency provisions similar to those in the present uniform operating agreements. American Railway Express Company was the sole railway express company in the country for a short period, until 1921, when Southeastern Express Company was formed to provide express transportation service over certain lines in that part of the country.

In 1929 Railway Express Agency, Inc., the defendant herein, was formed by the agreement and action of almost all the railroads. The Interstate Commerce Commission approved the acquisition of control of the Express Agency by the participating railroads by its order dated February 11, 1929. Indeed, the formation and ownership of the Express Agency by the railroads and its substitution for the more independent American Railroad Express Company is alleged to have been pursuant to suggestions made by members of the Interstate Commerce Commission.[5] In that order of February 11, 1929, the Commission also approved and authorized Article V of the proposed uniform operating agreement "solely insofar as it provides for a division of earnings for which the Commission's approval and authorization is required under paragraph (1) of Section 5 of the Interstate Commerce Act." The order further provided that "nothing herein shall be construed as approving any particular provisions of Article V or of any other part of said proposed operating agreement."[6] In 1938 Southeastern Express Agency was, in effect absorbed by Railway Express Agency, Inc. By its order dated June 1, 1938, the Interstate Commerce Commission approved the proposed pooling agreement between Railway Express Agency and the railroads which had formerly had operating contracts with Southeastern Express Company. However, it again expressly limited its approval of the proposed uniform operating agreement to the pooling provisions, using virtually the same language in its order, on that point, as the language above quoted from its order of February 11, 1929. In its opinion with reference to the acquisition of control of the Railway Express Agency by the participating railroads (150 I.C.C. 423), the Commission specifically noted that the uniform operating agreements to be executed by the Agency and the railroads would appoint the Express Agency the exclusive agent for conducting and transacting all the express transportation business on the lines of the respective railroads.

The present situation is, then that the Interstate Commerce Commission has approved and authorized the pooling arrangement and division of earnings provision of the uniform operating agreements between

2. 34 Stat. 584, 49 U.S.C.A. § 1.

3. 24 I.C.C. 380.

4. Proclamations Dec. 26, 1917, March 29, 1918, April 11, 1918, 40 Stat. 1733, 1763, 1769.

5. See dissenting opinion in 59 I.C.C. 459.

6. 150 I.C.C. 423.

the Express Agency and the railroads, which agreements were first made in 1929 and continue by their terms until 1954.

As a matter of convenience, I will now consider first the defendant's motion for dismissal without prejudice or for a stay. This motion is bottomed on the contention that there are issues in the present proceeding which must or should be first passed on by the Interstate Commerce Commission. More specifically, the defendant assigns three grounds for this contention:

(1) One of the principal issues before the court will be whether the Commission, in its prior orders under Section 5(1) of the Interstate Commerce Act, which authorized it to approve pooling arrangements,[7] has in fact necessarily approved the exclusive agency provisions of the uniform operating agreements. For if it has, such provisions may be excepted under Section 5(11) of the Transportation Act from the operation of the antitrust laws.[8] Defendant argues that the Commission is the authoritative body for the interpretation of its own reports and orders.

(2) The Commission retains a continuing jurisdiction over the proceedings which it has determined, under Section 5(9) of the Transportation Act.

(3) The issues before the court involve not only the antitrust laws but also the national transportation policy established in the Transportation Acts of 1920 and 1940, 49 U.S.C.A. § 1 et seq., the administration of which has been confided to the Interstate Commerce Commission. In this connection, defendant says, there are certain administrative questions to be determined, which the Commission is particularly qualified to pass on, such as (a) Has the express transportation business always been conducted on the basis of exclusive arrangements with each railroad? (b) Must it necessarily be so conducted? (c) Can the pooling arrangements approved by the Commission operate fairly and without discrimination except through the exclusive express agency created by the uniform operating agreements? etc. etc.

As against these arguments of the defendant, the Government contends that this court has plenary jurisdiction with respect to the alleged violations of the Sherman Act and that the enforcement of the antitrust laws is within the jurisdiction of the federal courts and not of the Interstate Commerce Commission, even when the alleged violations are committed by a carrier subject to regulation by the Commission.

---

7. 49 U.S.C.A. § 5(1), the pertinent portion of which is:

"Provided, That whenever the Commission is of opinion, after hearing upon application of any such carrier or carriers or upon its own initiative, that the pooling or division, to the extent indicated by the Commission, of their traffic, service, or gross or net earnings, or of any portion thereof, will be in the interest of better service to the public or of economy in operation, and will not unduly restrain competition, the Commission shall by order approve and authorize, if assented to by all the carriers involved, such pooling or division, under such rules and regulations, and for such consideration as between such carriers and upon such terms and conditions, as shall be found by the Commission to be just and reasonable in the premises."

8. 49 U.S.C.A. § 5(11), the pertinent portion of which is:

"The authority conferred by this section shall be exclusive and plenary, and any carrier or corporation participating in or resulting from any transaction approved by the Commission thereunder, shall have full power * * * to carry such transaction into effect and to own and operate any properties and exercise any control or franchises acquired through said transaction without invoking any approval under State authority; and any carriers or other corporations, and their officers and employees and any other persons, participating in a transaction approved or authorized under the provisions of this section shall be and they are hereby relieved from the operation of the antitrust laws and of all other restraints, limitations, and prohibitions of law, Federal, State, or municipal, insofar as may be necessary to enable them to carry into effect the transaction so approved or provided for in accordance with the terms and conditions, if any, imposed by the Commission."

Defendant relies, in support of its contentions which have been summarized above, on a long line of cases decided by the Supreme Court which it cites for the proposition that where in an action in the courts there are presented administrative questions or factual issues falling within the purview of the Interstate Commerce Commission, the Commission has primary jurisdiction and prior resort should be had to it for the determination of those questions. The cited cases are set out in the footnote.[9] An examination of these cases shows that they do, in a general sense, support the defendant's proposition. The effect of these cases was commented on by the Circuit Court of Appeals for the Second Circuit in United States Nav. Co. v. Cunard S. S. Co., 50 F.2d 83, 86,[10] in the following terms: "It is said that remedies afforded by the Interstate Commerce Act have been held exclusive only where administrative questions have been involved. But the tendency to extend the requirement of a preliminary inquiry by the Commission is significant. * * * It seems evident that the Supreme Court, after first holding in the Abilene case * * * that prior resort to the Commission must be had where uniformity of rates is affected by the decision of a question of fact, has proceeded far beyond the natural limitations of such a doctrine, and has, in general, insisted upon prior resort to the Commission wherever complicated questions of fact will arise and experience in technical matters is required. * * *"

The question arises, nevertheless, whether these cases have any application to a civil antitrust action brought by the Government, even if in such an action certain matters arise with respect to which the Interstate Commerce Commission has jurisdiction or with which it is peculiarly well qualified to deal because of its long continued and specialized experience. With one exception, all of the cases cited by the defendant were actions brought by private parties complaining of conduct by carriers such as discrimination in rates or unreasonable distribution of coal cars. The basic reason for requiring prior resort to the Commission seems to have been that only in that way could uniformity with respect to such matters be reasonably assured. The Commission's technical experience, as has been observed, was apparently another factor which was considered to make such prior resort desirable. In some cases, such as Terminal Warehouse v. Pennsylvania R. Co.,[11] the plaintiff sought to recover under the antitrust laws. The gist of the complaint was, however, discrimination in rates and the allowance of forbidden preferences, and the court held that resort should first be had to the appropriate administrative

9. Texas & P. R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, 9 Ann.Cas. 1075; Baltimore & O. R. Co. v. U. S. of America ex rel. Pitcairn Coal Co., 215 U.S. 481, 30 S.Ct. 164, 54 L.Ed. 292; Robinson v. Baltimore & Ohio R. Co., 222 U.S. 506, 32 S.Ct. 114, 56 L.Ed. 288; United States v. Pacific & Artic R. & Nav. Co., 228 U.S. 87, 33 S.Ct. 443, 57 L.Ed. 742; Texas & Pacific Ry. Co. v. American Tie & Timber Co., 234 U.S. 138, 34 S.Ct. 885, 58 L.Ed. 1255; Pennsylvania R. Co. v. Clark Bros. Coal Min. Co., 238 U.S. 456, 35 S.Ct. 896, 59 L.Ed. 1406; Northern Pacific Ry. Co. v. Solum, 247 U.S. 477, 38 S.Ct. 550, 62 L.Ed. 1221; Director General v. Viscose Co., 254 U.S. 498, 41 S.Ct. 151, 65 L.Ed. 372; Terminal R. R. Ass'n v. United States, 266 U.S. 17, 45 S.Ct. 5, 69 L.Ed. 150; Western & Atlantic R. R. v. Georgia Public Service Commission, 267 U.S. 493, 45 S.Ct. 409, 69 L.Ed. 753; Midland Valley R. Co. v. Barkley, 276 U.S. 482, 48 S.Ct. 342, 72 L.Ed. 664; Board of Railroad Com'rs v. Great Northern Ry. Co., 281 U.S. 412, 50 S.Ct. 391, 74 L.Ed. 936; Terminal Warehouse v. Pennsylvania R. Co., 297 U.S. 500, 56 S.Ct. 546, 80 L.Ed. 827; St. Louis, B. & M. Ry. v. Brownsville Nav. Dist., 304 U.S. 295, 58 S.Ct. 868, 82 L.Ed. 1357; Great Northern R. Co. v. Merchants' Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943.

10. Affirmed by the Supreme Court in 284 U.S. 474, at page 481, 52 S.Ct. 247, at page 249, 76 L.Ed. 408, in which the Court said: "The decisions of this court which deal with the subject under the Interstate Commerce Act are fully reviewed by the court below in an able and carefully drawn opinion."

11. Cited in footnote 9.

986

body, namely the Interstate Commerce Commission. Likewise, in Keogh v. Chicago & N. W. Ry. Co., 260 U.S. 156, 43 S. Ct. 47, 67 L.Ed. 183, it was strongly intimated that where illegal rates are established as the result of a conspiracy of carriers, the remedy of a private shipper is by recourse to the Interstate Commerce Commission and not under the antitrust laws, although the Government in the same circumstances may proceed under the antitrust laws.

The one case cited by defendant on this branch of the matter in which the action was brought by the Government was United States v. Pacific & Artic R. & Nav. Co., 228 U.S. 87, 33 S.Ct. 443, 57 L.Ed. 742. However, this case appears to indicate that the theory of prior resort to the Commission where "administrative questions" are involved, cannot be applied in an antitrust suit brought by the Government, at least if it is a criminal action. That was a criminal proceeding charging violations of the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, and of the Interstate Commerce Act, 49 U.S.C. A. § 1 et seq. The lower court sustained demurrers to the indictment, including the counts alleging violations of the Sherman Act, on the ground that administrative questions with reference to rates and similar matters were involved; and that they should first be passed on by the Interstate Commerce Commission. The Supreme Court reversed as to the antitrust counts, and made this observation, at page 105 of 228 U.S., at page 448 of 33 S.Ct.: "It is equally unimportant to consider whether the Interstate Commerce Commission has power to pass on the rates, as such, or through routing, as such. We are dealing with an indictment which charges a criminal violation of the anti-trust act, and of that the criminal courts have cognizance, with power of decision upon the principle which we have expressed."

That the general principle of the cases stemming from the Abilene case is not applicable to criminal antitrust proceedings seems to be further borne out by the recent analogous case of United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181, which was a criminal antitrust proceeding, and in which the Supreme Court held that the lower court had erred in holding that under the Capper-Volstead Act, 7 U.S.C.A. §§ 291, 292, the Secretary of Agriculture had exclusive jurisdiction, in the first instance, to determine whether farm cooperatives monopolize and restrain interstate trade.

With respect to civil antitrust actions brought by the Government, it has already been observed that the Supreme Court in the Keogh case strongly suggested that such actions stand on a different footing from proceedings brought by private parties to enforce their rights under the antitrust laws, although matters coming within the general purview of the Interstate Commerce Commission or some other administrative body may be equally involved. That there is such a distinction seems to be more definitely established by the case of U.S. Alkali Export Ass'n v. United States, 325 U.S. 196, 65 S.Ct. 1120, 1126, 89 L.Ed. 1554, which was a civil antitrust suit. There the defendant contended that certain of its export activities were removed from the scope of the Sherman Act and placed within the exclusive jurisdiction of the Federal Trade Commission by virtue of the Webb-Pomerene Act, 15 U.S.C.A. § 61 et seq. In rejecting this contention, the Supreme Court made this statement: "During the twenty-eight years between the enactment of the Sherman Act and the passage of the Webb-Pomerene Act, the plenary authority and settled practice of the Department of Justice to institute anti-trust suits, without prior proceedings by other agencies, became firmly established."

Upon a review of the authorities, therefore, I conclude that where an antitrust proceeding is brought by the Government, whether it be civil or criminal, the federal district court has, generally speaking, plenary jurisdiction, even though there are issues in the case which may involve what are broadly termed "administrative questions." There is, therefore, no occasion or justification for dismissal of this action on the theory that the Interstate Commerce Commission may have primary jurisdiction with respect to certain issues involved in it.

■ Despite this conclusion, however, I am of the opinion that there are circumstances peculiar to this case which make it desirable for this court to order a stay of the present action until the conclusion of the proceedings pending before the Interstate Commerce Commission. It seems clear that one of the issues which will have to be determined in this suit is whether the exclusive agency provisions of the uniform operating agreements are exempt from the operation of the antitrust laws, on the ground that they constitute a necessary or essential ingredient of or adjunct to the pooling arrangement and division of earnings agreement.[12] Whether they are necessary in that sense is one of the issues presented to the Commission by the defendant's petition of March 31, 1949. If the Commission proceeds to act on the petition, that question and other administrative issues which have a bearing on these proceedings may be passed on by the Commission, and it appears reasonable, therefore, to stay this action until the Commission has had an opportunity to do so, thereby making available to this court the findings and conclusions of the Commission with respect to matters with which it is peculiarly well qualified to deal. A stay of these proceedings will entail some delay in their ultimate disposition, but there is nothing to suggest that such a delay will prejudice the Government or the public, for which it is acting, to any appreciable degree. This is a civil suit; the violations of the antitrust laws, if they be such, are of long standing; it is not intimated that any particular person or firm is now in fact being prevented from going into the railway express business by the present arrangement; the proceedings before the Interstate Commerce Commission, although instituted after the Commencement of this action, are now actually pending; in the proceedings before the Commission, the railroads, as well as the parties here, have been served and can appear and it is possible that some benefit will accrue from that fact. It is for these several reasons that a stay in the action here is deemed appropriate and desirable, and not for want of power or jurisdiction in this court or by reason of primary jurisdiction in the Commission. Of course, it is obvious that this court is not at this time passing upon the existence of a monopoly as affected by existing competition or the situation of the defendant as an independent entity as contrasted with an agency arrangement for the various railroads or other matters presented to this court.

In view of the conclusion herein reached, the plaintiff's motion for judgment on the pleadings and defendant's motion to dismiss on the merits will be denied, with leave, however, to the parties to renew these motions, should they desire to do so after the conclusion of the proceedings before the Commission.

An order granting defendant's motion to stay may accordingly be submitted.

---

12. 49 U.S.C.A. § 5(11) provides: "* * * any carriers or other corporations, * * * participating in a transaction approved or authorized under the provisions of this section * * * are hereby relieved from the operation of the antitrust laws, * * * insofar as may be necessary to enable them to carry into effect the transaction so approved * * *."

I do not now pass on the question whether the exemption can extend beyond the precise transaction approved by the Commission.